2021 IL App (4th) 190697

NO. 4-19-0697

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
March 29, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| REBECCA LEE ARKEBAUER, | ) | Appeal from the |
| Plaintiff-Appellant, | ) | Circuit Court of |
| v. | ) | Sangamon County |
| SPRINGFIELD CLINIC and PETER J. KARRAS, | ) | |
| M.D., | ) | No. 12L152 |
| Defendants-Appellees. | ) | |
| | ) | Honorable |
| | ) | John W. Belz, |
| | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Justices DeArmond and Steigmann concurred in the judgment and opinion.

**OPINION**

¶ 1        Plaintiff, Rebecca Lee Arkebauer, brought a medical malpractice action against

defendants, Dr. Peter J. Karras and Springfield Clinic, alleging she was injured as the result of a

medical procedure negligently performed by Dr. Karras. In December 2018, a jury returned a

verdict in favor of defendants. Plaintiff appeals, arguing the trial court erred by (1) denying her

motions *in limine* to exclude certain evidence, (2) denying her motion for a mistrial based upon

the erroneous admission of evidence, and (3) allowing defendants to present closing argument that

was contrary to one of their judicial admissions. We affirm.

¶ 2                                I. BACKGROUND

¶ 3        On June 28, 2010, plaintiff underwent a colonoscopy performed by Dr. Karras at

Springfield Clinic. In the days following that procedure, she began to experience various symptoms including abdominal, back, and shoulder pain. On July 3, 2010, plaintiff sought emergency medical care and was found to have a ruptured spleen with internal bleeding. The following day, she underwent emergency surgery to have her spleen removed.

¶ 4 In June 2012, plaintiff initiated the underlying medical negligence action against defendants, and in July 2015, she filed a three-count amended complaint. In count I of her amended complaint, plaintiff alleged Dr. Karras was negligent in advising her about, and in performing, the colonoscopy procedure. Specifically, she asserted he owed her a duty to provide medical and surgical services in conformance with applicable standards of care, as well as sufficient information about the risks attendant to a colonoscopy. Plaintiff maintained Dr. Karras breached those duties by (1) exerting undue or excessive "force, torque, and/or traumatic contact with her [s]plenic [f]lexure and/or her [s]pleen" during her colonoscopy; (2) failing to advise or warn her "about the known possibility that the [c]olonoscopy procedure might or could cause injury to her [s]pleen"; (3) failing to warn or advise her that she should not take aspirin or other blood-thinning medications after her colonoscopy; and (4) "otherwise *** employing surgical technique and/or instruments in a manner not within the prevailing standards of care." Plaintiff asserted Dr. Karras's negligent acts or omissions caused her injuries, including the ultimate removal of her spleen, "permanent loss of her normal life," and pain and suffering. Additionally, she maintained she would not have consented to the colonoscopy procedure had she known "of the undisclosed risks" she faced, including the loss of her spleen.

¶ 5 In count II of her amended complaint, plaintiff alleged negligence by Dr. Karras based on the doctrine of *res ipsa loquitor*. Finally, in count III of her amended complaint, she

alleged negligence by Springfield Clinic based on the doctrine of *respondeat superior*.

¶ 6        In August 2015, defendants filed an answer to plaintiff's amended complaint. They admitted that, prior to performing plaintiff's June 2010 colonoscopy, "neither Dr. Karras nor any other medical provider at the Springfield Clinic" advised or warned plaintiff "about the possibility or probabilities of injury to her [s]pleen attendant to the [c]olonoscopy." However, defendants denied having a duty to disclose or warn of the risk of a splenic injury and disputed the claim that they were negligent in their care and treatment of plaintiff. Defendants did not plead any affirmative defenses.

¶ 7        Prior to trial, the parties filed various motions. Relevant to this appeal, plaintiff filed motions *in limine* seeking to bar any evidence or argument that she was contributorily negligent or comparatively at fault for causing her injuries (plaintiff's motion *in limine* No. 3), as well as any evidence or argument that she failed to mitigate her damages or injuries (plaintiff's motion *in limine* No. 4). She asserted that any claim that her own conduct contributed in whole or in part to the injuries she complained of had to be raised by defendants in their pleadings as an affirmative defense and noted defendants' pleadings did not assert any such defenses. Plaintiff requested an order barring defendants "from making any mention whatsoever of any act and/or omission on [her] part *** that might or could be construed *** to mean that [she] contributed to [the] cause [of] her injuries" or "failed to follow any doctors' or nurses['] instructions or otherwise failed to mitigate her damages."

¶ 8        In February 2018, the trial court conducted a hearing on pending motions in the case, including plaintiff's motions *in limine* Nos. 3 and 4. Although the record contains no transcript of the hearing, it does contain the court's docket entry, showing plaintiff's motion

*in limine* No. 3 was "granted as to surgery itself" and plaintiff's motion *in limine* No. 4 was "taken under advisement."

¶ 9        In October 2018, plaintiff filed a motion to clarify the trial court's ruling on her motion *in limine* No. 3 and to obtain a ruling on her motion *in limine* No. 4 (motion to clarify). In connection with that motion, she, again, argued that facts constituting any affirmative defense, including that the negligence of the plaintiff contributed in whole or in part to his or her injury, had to be plainly set forth in a defendant's pleadings. She asserted defendants "never pled the defense of contributory or comparative negligence, the defense of the failure to follow doctor's orders, the defense of the failure to mitigate injuries or damages, or any other defense ***." Accordingly, she maintained defendants could not assert them at trial.

¶ 10        Plaintiff further acknowledged that defendants had previously responded to her motions by arguing they could raise a sole proximate cause defense at trial without having to explicitly plead it as a defense. However, she maintained defendants had no factual basis to support that defense and argued as follows:

        "At oral argument [on the motions in February 2018], the Defendants' only response to this failure to plead any defense was that the 'sole proximate cause defense' need not be explicitly plead[ed] as a defense. Yes, but there must be competent evidence showing that either some third party's acts/omissions or the Plaintiff's acts/omissions were *the sole* proximate cause of Plaintiff's injuries. Hence, although it is true that a defendant need not formally plead that plaintiff's acts or omissions were the sole proximate cause of the injuries of which he/she complains in order to assert this defense, here, in light of the facts and the

- 4 -

Defendants' own experts' opinion testimony, under Illinois law there is no basis for the assertion of the sole proximate cause defense. \*\*\* [T]he defense here cannot make a good faith assertion that any act or omission on the part of Plaintiff was *the sole* proximate cause of her [s]pleen injury or the necessary [s]plenectomy procedure \*\*\*." (Emphases in original.)

¶ 11 Defendants filed a written response to plaintiff's motion to clarify, arguing they were not required to plead an affirmative defense to introduce relevant proximate cause evidence and that there was evidence supporting a sole proximate defense and jury instruction. They also asserted plaintiff's pleadings made "relevant" post-colonoscopy discharge events, including the discharge instructions plaintiff received. In particular, defendants noted plaintiff's amended complaint contained allegations that she was not advised to refrain from taking aspirin or other blood-thinning medication after her colonoscopy and that her health progressively worsened after her procedure. Defendants argued that granting plaintiff's motions would preclude them from rebutting her allegations.

¶ 12 Plaintiff filed a reply to defendants' response, arguing defendants were attempting to assert that she was contributorily negligent or failed to mitigate her damages by not following doctors' orders under the "guise" of a sole proximate cause defense. She argued no factual basis existed for a sole proximate cause defense, noting, in part, that defendants' medical experts opined Dr. Karras "alone on his own caused the initial injury to Plaintiff's [s]pleen during the \*\*\* [c]olonoscopy." Plaintiff maintained defendants essentially asserted that she was "blameworthy for contributing to cause an exacerbation of her [s]pleen injury *after* Dr. Karras injured her [s]pleen during the [c]olonoscopy," not that "any act or omission on [her] part \*\*\* was *the sole* proximate

cause of her [s]pleen injury." (Emphases in original.) Additionally, plaintiff argued that the allegations of her complaint could not "open[ ] the door" to defendants presenting affirmative defenses they did not plead.

¶ 13        On December 3, 2018, the trial court conducted a final pretrial hearing in the matter and addressed plaintiff's motion to clarify. Following a lengthy discussion of the matter, the court found a "sole proximate cause defense [was] allowable in *** Illinois." It then took the matter under advisement, stating it would review depositions submitted by the parties to determine if there was "enough evidence for [that defense] to be presented to the jury." On December 6, 2018, the court entered the following docket entry: "After careful consideration, the Court Clarifies the Ruling on Plaintiff's Motion *in Limine* #3 and #4. The Court finds sufficient evidence in the record[,] namely depositions provided to the Court[,] to allow the defendant[s] to proceed with a Sole Proximate Cause Defense in this case."

¶ 14        From December 10 to 19, 2018, a jury trial was conducted in the matter. Plaintiff's evidence included her own testimony, as well as testimony from her husband; her brother; a family acquaintance; Dr. Karras as an adverse witness; Dr. Robert McClintock, her primary care physician; Dr. Kristopher Mitchell, the doctor who performed her emergency splenectomy; and medical experts, including Dr. Olu Sangodeyi and Dr. Harold Fenster.

¶ 15        Plaintiff's evidence showed that prior to June 2010, she had been treated for hypertension and was taking aspirin on a daily basis. In April 2010, she sought treatment with Dr. McClintock and reported an incident of rectal bleeding. On June 28, 2010, she underwent a colonoscopy performed by Dr. Karras at Springfield Clinic. Plaintiff testified she met with an anesthesiologist prior to the procedure and reported that her current medications included aspirin.

- 6 -

¶ 16        After the colonoscopy, Dr. Karras informed plaintiff that the procedure went well, and she was discharged home. Plaintiff and her husband testified that neither Dr. Karras nor any nurse at Springfield Clinic told her not to take aspirin after her procedure. In the days following her colonoscopy, plaintiff began to experience pain in her stomach, back, and shoulder, which progressively worsened. On July 3, 2010, she became very ill while visiting her mother and was taken to the hospital by ambulance for emergency medical care. Plaintiff was found to have internal bleeding at the location of her spleen and, on July 4, 2010, underwent emergency surgery with Dr. Mitchell to remove her spleen. The parties stipulated that "the injury to [plaintiff's] spleen that occurred during the course of the colonoscopy did not involve negligence on the part of [plaintiff]."

¶ 17        While testifying during plaintiff's case, Dr. Karras stated he was a gastroenterologist and, in June 2010, was performing approximately 15 colonoscopies a week. He asserted that prior to plaintiff's colonoscopy, he informed plaintiff of the most frequent complications associated with the procedure, including a perforated colon and bleeding. Although Dr. Karras was aware before 2010 that a colonoscopy procedure could cause injury to the spleen, he agreed he did not inform plaintiff of the possibility of a splenic injury. He asserted "[p]hysicians don't have to inform patients of every single risk associated with a procedure" and that providing such information "could scare more patients away from having a very valuable test."

¶ 18        Dr. Karras further testified that when performing plaintiff's colonoscopy, the applicable standard of care required that he not use excessive force with the scope during the procedure and not "miss polyps or colon cancer." He agreed that he did not know how much force he exerted during the procedure, stating an instrument to measure such a thing did not exist. However, he denied that he used excessive force, stating "the scope was in [his] hand, and [he]

met no resistance." Dr. Karras agreed that the injury to plaintiff's spleen "most likely" occurred during her colonoscopy.

¶ 19        Dr. Mitchell testified that during plaintiff's splenectomy, he observed a large amount of blood in her abdomen. He opined "that there was a bleed in [plaintiff's] spleen that over time built up pressure and caused the capsule [of her spleen] to rip off." Dr. Mitchell agreed that the "most likely" cause of plaintiff's initial splenic injury was "torque during the colonoscopy Dr. Karras performed" in the area of the "splenic flexure" of the colon, which attaches to the spleen. He stated that "during a colonoscopy, *** a scope that goes past the splenic flexure can pull on the spleen capsule and tear it." Regarding plaintiff's case, he further stated as follows on direct examination by plaintiff's counsel:

> "So my best recollection, in reviewing the chart and looking at everything, is that likely what happened was, there was a little torquing that caused a little tear in the splenic capsule and she got a small bleed and then she took a bunch of ibuprofen and aspirin and continued to bleed over the five days which then eventually ruptured [the spleen]."

¶ 20        Dr. Mitchell further offered testimony that taking aspirin was "not a contraindication to do a colonoscopy." However, he asserted "adding more aspirin and more ibuprofen would increase [plaintiff's] risk." Dr. Mitchell asserted his belief that the anesthesiology record from prior to plaintiff's colonoscopy, indicating that aspirin was one of her current medications, "probably was pre-populated." He also testified that plaintiff reported to him that "she was taking ibuprofen and aspirin for pain control" after her colonoscopy.

¶ 21        On cross-examination, Dr. Mitchell testified that plaintiff reported to him that she

experienced pain symptoms approximately 24 hours after her colonoscopy. She also stated "she took ibuprofen or aspirin to manage the pain, and her symptoms continued to increase." Dr. Mitchell opined plaintiff had a tear "somewhere on the spleen as a result of the colonoscopy," the injury "caused some bleeding[,] and the bleeding was made worse by [plaintiff's] continued use of ibuprofen or aspirin." Finally, Dr. Mitchell explained that "pre-populated" meant that a patient's past medical history automatically "shows up in [a] note" without being "filled *** out" at the time of a current visit.

¶ 22    Dr. Sangodeyi testified he was a board-certified general surgeon. He estimated that during his medical career he had performed approximately 6000 colonoscopies and at least 1000 surgeries on patients with traumatic spleen injuries. He opined plaintiff's spleen was injured during her June 2010 colonoscopy and that the most likely cause of that injury was "the torque and force" Dr. Karras exerted on plaintiff's splenic flexure during the procedure. He testified that Dr. Mitchell's operative note described "a large injury to the spleen" and a "large amount of blood in the abdomen."

¶ 23    Dr. Sangodeyi further opined that Dr. Karras's failure to discover plaintiff's splenic injury lessened the likelihood of saving her spleen from being totally removed. He believed Dr. Karras should have discovered plaintiff's splenic injury the day of the colonoscopy, June 28, 2010, or by the day after that procedure, June 29, 2010, when plaintiff began experiencing shoulder and abdominal pain. He opined that by June 29, it was "more likely than not" that plaintiff's injury would require a total splenectomy. On direct examination, Dr. Sangodeyi further testified he did not see any documentation in plaintiff's medical records indicating that she was advised not to take aspirin either before or after her colonoscopy.

¶ 24 On cross-examination, Dr. Sangodeyi testified he did not know whether plaintiff's splenic injury started out as a relatively small bleed that evolved into a more severe bleed. He acknowledged that a splenic bleed is a known colonoscopy complication and that such a complication could be "self-limiting," meaning "it stops on its own."

¶ 25 Dr. Fenster, a board-certified general surgeon, estimated he had performed approximately 6000 colonoscopies over the course of his career. He also opined plaintiff's splenic injury occurred during her colonoscopy. He testified such injuries were "usually caused by traction of the splenic flexure by the colonoscopist" and opined that "more likely than not, [Dr. Karras] caused[,] by excessive force[,] a shearing effect that tore [plaintiff's] splenic capsule." In Dr. Fenster's opinion, Dr. Karras violated the standard of care of a reasonably qualified colonoscopist during plaintiff's colonoscopy.

¶ 26 Dr. Fenster further opined that the fact that plaintiff had been taking aspirin prior to the colonoscopy was "a risk factor," in that aspirin prevents coagulation. He testified the applicable standard of care required Dr. Karras to tell plaintiff to stop taking aspirin before her colonoscopy or to cancel the colonoscopy if plaintiff reported aspirin as one of the medications she had been taking on the day the procedure was set to take place.

¶ 27 Dr. Fenster opined defendants had a duty to inform plaintiff about the risks and complications of a splenic injury before her colonoscopy. He testified such a duty stemmed from the severity of the risk and that rarity of the risk did not "trump" severity in terms of disclosures to a patient. Dr. Fenster stated defendants deviated from the applicable standard of care by failing to inform plaintiff of such a risk. Finally, Dr. Fenster testified it was his opinion that nothing plaintiff "did after [her] colonoscopy caused or contributed to cause her ultimate outcome with

respect to her spleen."

¶ 28    On cross-examination, Dr. Fenster agreed the amount of force necessary to cause a splenic bleeding complication during a colonoscopy was unknown. He agreed that human beings have "anatomical uniqueness" and there was "no way to know how the splenocolic ligament is attached to the spleen." He agreed that it was true to say that plaintiff's "spleen could have been injured without excessive force during the performance of th[e] colonoscopy." Dr. Fenster further agreed that there was no specific literature, text, or protocol that required informing a colonoscopy patient about the risk of injury to the spleen, specifically.

¶ 29    In their case-in-chief, defendants presented testimony from Dr. Karras and two nurses who cared for plaintiff on the day of her colonoscopy—Lori Lascelles and Lori Jean Butler. Defendants' witnesses also included retained medical experts Dr. Douglas Rex and Dr. Craig Smith. Dr. Rex testified he was a board-certified gastroenterologist and estimated that he had performed 45,000 colonoscopies throughout his 30-year career. He opined it was "more likely than not, [Dr. Karras] complied with the standard of care" in his care and treatment of plaintiff.

¶ 30    Dr. Rex testified that injuries to the spleen during a colonoscopy were "believed to be able to occur with [doctors] using forces of pushing, torquing, and withdrawing that are not outside the range of forces that [they] normally use ***." He asserted such injuries were rare and "occur without doing something that is inappropriate or careless or negligent on the part of how the endoscopist was using the scope." He opined a bleeding injury to the spleen could occur without the use of excessive force.

¶ 31    Dr. Rex further testified that the applicable standard of care did not require advising the patient to discontinue aspirin prior to a colonoscopy. He stated that in his practice, declining

- 11 -

to proceed with the colonoscopy when the patient "came in for the procedure prepped ready to go and they were on aspirin" would "[v]irtually never *** happen." He testified he would have proceeded with plaintiff's colonoscopy whether or not she was taking aspirin.

¶ 32 Dr. Rex also opined that disclosing the possibility of a splenic injury as a potential risk prior to a colonoscopy "was not required in 2010." He asserted it was common at the time of plaintiff's procedure to warn of the risks of bleeding, perforation, and drug reactions. However, he believed it was "quite unusual for people to get consent for splenic injury primarily because of the rarity of the *** type of the injury."

¶ 33 On cross-examination, Dr. Rex acknowledged that he did not know how much pressure or force was exerted by Dr. Karras during the colonoscopy. He also agreed that plaintiff's splenic injury "occurred from things that happened during the colonoscopy." Further, Dr. Rex denied that there was a significant increase in risk from the removal of polyps when the patient was taking aspirin either before, during, or after the procedure.

¶ 34 Dr. Smith testified he was a general surgeon. According to him, plaintiff's medical records indicated she was stable following her colonoscopy, and he opined it was reasonable for her to be discharged. On cross-examination, Dr. Smith agreed plaintiff's spleen was injured during the colonoscopy performed by Dr. Karras.

¶ 35 Lascelles testified that she was a registered nurse and involved in caring for plaintiff at the time of her colonoscopy. She assisted in admitting plaintiff and prepping her for the procedure. Lascelles testified that, according to the medical records, plaintiff spoke with a "phone nurse" prior to her colonoscopy. Plaintiff's medical records indicated the nurse asked plaintiff about aspirin or other blood thinners and then the nurse documented that those medications were

"nonapplicable," indicating plaintiff was not taking them at that time. Lascelles also testified that she asked plaintiff if she was taking aspirin or nonsteroidal anti-inflammatory drugs (NSAIDs) on the day of her colonoscopy, and plaintiff answered that she was not. Lascelles stated she also reviewed "discharge instructions" with plaintiff. Those included informing patients to call if they experienced symptoms including rectal bleeding, fever, lightheadedness, persistent tenderness, sharp or severe abdominal pain, nausea, or vomiting. Lascelles testified she informed patients to avoid NSAID products for two weeks if they had several polyps or a large polyp removed.

¶ 36        On cross-examination, Lascelles testified aspirin was an NSAID and that she would have informed plaintiff of that fact. She acknowledged stating the opposite at her deposition—that she told plaintiff aspirin was not an NSAID. However, Lascelles maintained she was mistaken at the time of her deposition testimony.

¶ 37        Butler testified she too was a registered nurse. On June 28, 2010, she saw plaintiff after her colonoscopy in "the recovery, postanesthesia area." Once patients were in that area, Butler would monitor them and assess their vitals. Once a patient was awake, she would review discharge instructions with the patient. Butler testified plaintiff's medical records showed her vital signs were stable and within normal limits. She stated she explained plaintiff's discharge or "home care" instructions to her, including symptoms "to look out for" and avoidance of NSAID products for two weeks with the removal of several polyps or a large polyp. According to Butler, she usually explained that NSAID meant "nonsteroidal anti-inflammatory" and that it included products "that contain aspirin."

¶ 38        When testifying on his own behalf, Dr. Karras opined his care and treatment of plaintiff complied with applicable standards of care. He asserted that on May 18, 2010, he met

with plaintiff for the first time and explained the risks of colonoscopy, including bleeding, perforation, and the adverse effects of sedation. Dr. Karras stated he also went over risks with plaintiff on the day of her colonoscopy. During plaintiff's colonoscopy, Dr. Karras found and removed polyps, which were sent to the pathology department for analysis. One polyp was determined precancerous.

¶ 39    During Dr. Karras's testimony, defense counsel questioned him regarding a "request and authorization for operation and/or procedure" form signed by plaintiff. Defendants' counsel asked Dr. Karras the following question: "[U]nder paragraph three, it discusses unforeseen conditions which may arise, and my question is this: Is a splenic bleeding complication the kind of unforeseen condition which may arise?" Plaintiff's counsel objected and, during a sidebar in the proceedings, argued defendants were impermissibly attempting to contradict a judicially admitted answer to plaintiff's complaint that they "never made any mention whatsoever or gave [plaintiff] any information about spleen injury." The following colloquy then occurred between the parties and the court:

"MR. BISWELL [(DEFENSE COUNSEL)]: Number one with this, I'm going to ask him if a splenic injury is unforeseen, and he's going to explain the incidence of it and how frequently it occurs and how it is an unforeseen [*sic*]. It's broad. It's a broad—

MR. STANDA [(PLAINTIFF'S COUNSEL)]: He could have asked that, but he's tying it to this document and—

THE COURT: Let's move on from the document and ask your questions. You can ask the questions, but you can't ask about the document. I don't want to

- 14 -

hear any questions about the document, but you can ask about splenic injury and the level of occurrence.

MR. STANDA: So you're going to sustain my objection and strike that question?

THE COURT: Yes.

MR. STANDA: Thank you, Your Honor.

THE COURT: But I'm going to allow him to get into the unforeseen splenic injury.

MR. BISWELL: So I can ask him if splenic injury is unforeseen?

THE COURT: You can ask him—I don't want you using that language, but you can ask—you can ask how often it is, the types of splenic injury, and how often it occurs, and then let's move on."

Dr. Karras went on to testify that a splenic bleeding complication was an extremely rare occurrence.

¶ 40    Later, defense counsel asked Dr. Karras whether "the consent [form] at issue *** discuss[ed] different or additional procedures" and whether a splenectomy would "be a different or additional procedure." Dr. Karras responded "yes" to both questions, and plaintiff's counsel objected, arguing the trial court "just ruled on this." During a sidebar, plaintiff's counsel also moved for a mistrial, arguing defendants were "trying to go around [their] judicial admission." Defense counsel responded that the extent of defendants' agreement was that they "did not discuss specifically the word 'spleen' or 'splenic injury' " with plaintiff but asserted defendants did not say they "wouldn't go into other things." Following further argument by the parties, the court

- 15 -

determined it would sustain plaintiff's counsel's objection but would allow defendants' counsel to present argument on the topic during his closing argument. Plaintiff's counsel asserted he "object[ed] to that" but understood the court's ruling.

¶ 41   Dr. Karras then testified that the standard of care did not require him to use the words "spleen" or "splenic injury" when informing plaintiff of the risks of a colonoscopy procedure. He asserted that in 2010, physicians did not inform patients of the risk of splenic injury with a colonoscopy. Dr. Karras testified the standard of care did not require a physician to specifically state all risks.

¶ 42   Dr. Karras further testified plaintiff's colonoscopy was not technically difficult. He asserted he would have documented any difficulties "in [his] note." In plaintiff's case, he noted "the procedure was well tolerated," indicating it was not a technically difficult examination and he "had no problems advancing the scope." Dr. Karras testified splenic injuries could occur during a colonoscopy "when the doctor does everything right."

¶ 43   Dr. Karras also testified he recommended that his patients avoid blood thinners after the removal of polyps because the area could bleed. According to Dr. Karras, plaintiff was specifically told to avoid aspirin for 10 to 14 days. He asserted he met with plaintiff and her husband after the procedure and discussed the procedure and "postpolypectomy" instructions.

¶ 44   Finally, defendant's evidence established a Springfield Clinic nurse telephoned plaintiff the day after her colonoscopy. Additionally, on July 1, 2010, plaintiff was notified of her biopsy results. Dr. Karras maintained the symptoms plaintiff experienced after the colonoscopy were never reported to him and he did not learn of any complications she had until July 7, 2010, when he learned of her emergency surgery.

¶ 45    The record reflects that following the presentation of evidence, a jury instruction conference occurred without a court reporter present. The following day, the court made a record of what occurred during the unreported conference, stating it had refused defendants' sole proximate cause instructions. It further stated as follows:

"Based on the evidence that's been presented, I do think what came out in front of the jury, which happens, deviated from the—from the depositions and things that the Court was provided with. At this point in time, I cannot find sufficient evidence for the sole proximate cause instructions to go back to the jury. You know, if anything, the evidence may be the other way, sole proximate cause was the surgery, not other events, so in light of the way the evidence has come out, I am refusing the sole proximate cause instruction based on the evidence that was provided in the course of this trial."

¶ 46    The trial court then asked whether plaintiff had a limiting instruction she wanted it to consider. Plaintiff's counsel responded that plaintiff did, arguing testimony that was highly prejudicial to plaintiff's case was presented "blaming her for contributing to cause her ultimate outcome of splenectomy." Plaintiff's counsel then presented the following instruction:

"I am striking all testimony and evidence in this case and ordering you to disregard all testimony and opinions and other evidence regarding Plaintiff having taken aspirin and/or NSAIDs after the colonoscopy procedure and all testimony opinions and other evidence regarding Plaintiff's supposed failure to follow doctor's or nurses' orders or instructions after the colonoscopy procedure and all testimony, opinions, and other evidence to the effect that something Plaintiff did or

failed to do caused or contributed to cause her spleen injury and/or the need for her splenectomy surgery."

¶ 47          Defendants objected, asserting (1) some of the evidence targeted by the instruction was presented to rebut plaintiff's claims of "a delay in diagnosis [of her injury]" by Dr. Karras, (2) they would present no argument that blamed plaintiff for causing her injury, (3) the instruction was confusing and misleading, and (4) the Illinois Pattern Jury Instruction on proximate cause would sufficiently inform the jury that the evidence targeted by the instruction "doesn't matter." The trial court gave the instruction over defendants' objection.

¶ 48          Ultimately, the jury found in favor of defendants and against plaintiff. The record reflects that during their deliberations, the jury sent the following two notes: (1) "The jury would like to request that the parties work towards a settlement while we continue to deliberate" and (2) "What if we agree on one count but not the other?" In response to both notes, the trial court instructed the jury to "[p]lease continue your deliberations."

¶ 49          In May 2019, plaintiff filed a posttrial motion. She argued she was denied a fair trial by defendants' presentation of prejudicial evidence related to her alleged fault in contributing to her injuries under the guise of a sole proximate cause defense. Plaintiff also argued reversible error occurred through defendants' attempts to contradict their judicial admission that they "did not inform Plaintiff before the [c]olonoscopy procedure about the known risk" of injury to the spleen.

¶ 50          The same day plaintiff's posttrial motion was filed, her attorney filed a "Bystander's Affidavit," citing Illinois Supreme Court Rule 323(c) (eff. July 1, 2017), "concerning events that occurred *** during the course of trial ***, but without benefit of a court reporter ***."

He averred that during the jury instruction conference, the trial court rejected defendants' sole proximate cause instructions. Thereafter, "a short discussion ensued regarding the ramifications of [the court's] decision, but a full discussion on the topic was tabled until the next morning[.]" Plaintiffs' counsel asserted "a substantive discussion" of the matter occurred the next morning before the arrival of the court reporter, with the court asking for plaintiff's counsel's thoughts on the matter. Plaintiff's counsel maintained the following then occurred:

> "[Plaintiff's counsel responded] by stating that he was loath to request a mistrial after so much time and money had been spent on this trial, but that he had to ask for a mistrial because during trial there had been so much highly prejudicial evidence adduced for the jury to hear under the guise of the sole proximate cause defense[.] *** In addition, [plaintiff's counsel] stated that if the Court were not inclined to grant a mis[ ]trial, which [the court] indicated [it] was not, then, at minimum, the Plaintiff wanted the Court to give an instruction to the jury before closing arguments, which would tell the jury that the Court was striking and they should disregard, all of the irrelevant evidence adduced blaming Plaintiff ***. In response to this, [the court] stated that [it] was inclined to give such an instruction to the jury, and specifically directed [plaintiff's counsel] to draft a proposed jury instruction addressing this; to which [defendants' counsel] objected."

¶ 51 In September 2019, the trial court conducted a hearing on plaintiff's posttrial motion. In presenting argument on the motion, plaintiff's counsel argued defendants improperly "put on days' worth of testimony blaming" plaintiff for contributing to her injury and, again, referred to matters that occurred without the court reporter present. In particular, counsel noted

plaintiff's desire for a mistrial or curative instruction following the court's sole-proximate-cause ruling and the court's statement "that [it was not] going to give a mistrial, but [it] would give a curative instruction."

¶ 52 Ultimately, the trial court denied plaintiff's motion. It noted that it had considered the record, the evidence presented at trial, and the briefs submitted by the parties. The court found sufficient evidence was presented to support the jury's verdict. It further stated as follows:

"I also don't find that any ruling was overtly erroneous and not overtly prejudicial. I find that if there was [*sic*] problems with the ruling, there was a curative instruction that was given to the jury. I do not feel, based on the total record and everything that was presented, that the defendant overly blamed the plaintiff for what occurred[.]"

¶ 53 This appeal followed.

¶ 54                                    II. ANALYSIS

¶ 55                          A. Evidence of Plaintiff's Conduct

¶ 56 On appeal, plaintiff first argues the trial court erred by denying her motions *in limine* to exclude "any evidence that [her] conduct caused or contributed to her harm or that she failed to mitigate her damages." She maintains such evidence was relevant only to determining issues of contributory negligence and failure to mitigate harm, which are affirmative defenses that defendants were required, but failed, to plead in their answer. She also argues the challenged evidence could not be properly admitted in connection with a sole proximate cause defense because that defense "is concerned with the conduct of non-party individuals or other conditions that are the sole cause of harm, and not the conduct of the plaintiff."

¶ 57    Plaintiff further maintains that the trial court's denial of her motions resulted in an unfair trial because "highly prejudicial" evidence was presented to the jury. As a result, she asserts the court should have granted her request for a mistrial at the close of the evidence.

¶ 58    1. *Trial Court's Denial of Plaintiff's Motions* in Limine

¶ 59    Initially, we note defendants argue plaintiff has forfeited her challenge to the trial court's denial of her motions *in limine*. They contend that to preserve the issue of a court's pretrial evidentiary rulings for appellate review, a party is required to raise contemporaneous objections at trial to the evidence he or she sought to have excluded. Defendants maintain plaintiff raised no such objections at trial in this case.

¶ 60    "When the [trial] court makes its rulings before trial in response to the parties' motions *in limine*, the rulings are interlocutory and remain subject to reconsideration throughout trial." *Baumrucker v. Express Cab Dispatch, Inc.*, 2017 IL App (1st) 161278, ¶ 54, 84 N.E.3d 482; see also *McHale v. Kiswani Trucking, Inc.*, 2015 IL App (1st) 132625, ¶ 36, 39 N.E.3d 595 ("[A] trial court rules on a motion *in limine* before hearing the full evidence at trial that may justify admission or require exclusion of the evidence. [Citation.] Therefore, the court's ruling on a motion *in limine* is an interlocutory order and always subject to reconsideration during trial."). Thus, "[t]he denial of a motion *in limine* does not in itself preserve an objection to disputed evidence that is introduced later at trial." *Simmons v. Garces*, 198 Ill. 2d 541, 569, 763 N.E.2d 720, 738 (2002).

¶ 61    Instead, "[w]hen a motion *in limine* is denied, a contemporaneous objection to the evidence at the time it is offered is required to preserve the issue for review." (Internal quotation marks omitted.) *Id.*; see also Ill. R. Evid. 103(b)(3) (eff. Oct. 15, 2015) ("In civil trials, even if the

court rules before or at trial on the record concerning the admission of evidence, a contemporaneous trial objection or offer of proof must be made to preserve a claim of error for appeal."); *People v. Denson*, 2014 IL 116231, ¶ 19, 21 N.E.3d 398 (explaining that, following the denial of a motion *in limine*, a contemporaneous objection is required in civil cases). "While there is not always a need to repeat the objection each time similar evidence is presented \*\*\*, one must nonetheless object the first time the evidence is introduced." *Illinois State Toll Highway Authority v. Heritage Standard Bank & Trust Co.*, 163 Ill. 2d 498, 502, 645 N.E.2d 896, 898 (1994).

¶ 62        Here, plaintiff does not point to contemporaneous objections she raised at trial to the evidence she sought to exclude in her motions *in limine*. Instead, quoting this court's decision in *Cunningham v. Millers General Insurance Co.*, 227 Ill. App. 3d 201, 207, 591 N.E.2d 80, 84 (1992), she asserts an exception to the forfeiture rule applies where "a trial court's ruling on a motion *in limine* is so definite and unconditional that the parties may treat it as controlling." Plaintiff contends that the court's denial of her motions in this case was so definite and controlling that she was not required to raise contemporaneous trial objections to preserve her evidentiary challenges. We disagree with plaintiff's assertion and find no such "exception" to the forfeiture rule exists. To the extent *Cunningham* holds otherwise, we find it was wrongly decided and decline to follow it.

¶ 63        Like in this case, the defendant in *Cunningham* argued the plaintiffs' challenge to the admission of evidence was not preserved for review because, after the trial court denied the plaintiffs' motion *in limine* to exclude the evidence, the plaintiffs "failed to make any objection at the time the evidence was introduced." *Id.* at 204-05. In considering the issue on review, this court noted the rule that "[w]hen a motion *in limine* is denied, the unsuccessful movant is left with the

procedure of specifically objecting to the evidence when it is offered at trial." *Id.* at 206. However, as noted by plaintiff, we also stated as follows:

> "Sometimes a trial court's ruling on a motion *in limine* is so definite and unconditional that the parties may treat it as controlling. [Citation.] The Second District Appellate Court has declined to find a waiver where it appeared [the] defendant failed to object based on [the] defendant's misinterpretation that the court's ruling on the motion *in limine* conclusively admitted the evidence. [Citation.]" *Id.* at 207.

Ultimately, we held the plaintiffs' challenge to the admission of evidence was not properly preserved, finding the "exception" did not apply because "the trial court specifically reserved the right to modify its ruling" and the moving party "did not object at a time when the objection could have been acted upon by the trial court." *Id.* at 207-08.

¶ 64    In referencing the above exception for "definite and unconditional" *in limine* rulings, *Cunningham* relied on two cases: *Woodward v. Mettille*, 81 Ill. App. 3d 168, 400 N.E.2d 934 (1980), and *Lundberg v. Church Farm, Inc.*, 151 Ill. App. 3d 452, 502 N.E.2d 806 (1986). In the first case, *Woodward*, 81 Ill. App. 3d at 178, the plaintiffs challenged a jury's finding that they were contributorily negligent. The defendant, in turn, argued the plaintiffs had "waived" the issue "by failing to offer an instruction without mention of their due care." *Id.* On review, the Third District found the issue had been preserved, stating as follows:

> "We find that [the] plaintiffs sufficiently preserved the issue through two motions *in limine*, one during trial and one before, both of which sought to preclude evidence or argument on the question of [the] plaintiffs' due care. These motions

- 23 -

were denied, and it would not be in the interests of fairness to conclude that [the] plaintiffs, faced with the court's decision that their due care was in issue, were required to continue to object or to submit instructions in order to preserve the issue for appeal." *Id.*

¶ 65        We note *Woodward* neither referenced the rule that requires a contemporaneous objection following the denial of a motion *in limine* nor did it rely on the specific "exception" expressed in *Cunningham*. Instead, the *Woodward* court simply held that it was unfair to apply the "waiver" rule where there had been two motions *in limine* addressing the issue raised on appeal, one of which was presented at trial. We find *Woodward* provides no basis for concluding—as *Cunningham* suggests is permissible—that the trial court's initial denial of a motion *in limine* may somehow be determined definite, conclusive, or unconditional enough—on its own—such that the contemporaneous objection requirement does not apply.

¶ 66        Second, in *Lundberg*, 151 Ill. App. 3d at 460, the defendant filed a motion *in limine* on the day of trial, seeking to exclude certain testimony. "The [trial] court had no opportunity to carefully review the motion, and tentatively ruled that the evidence was admissible *** , stating that specific objections could be made at trial." *Id.* However, the defendant failed to object to the challenged evidence when it was introduced. *Id.* The Second District noted the rule that "[w]here no objection is made to improper evidence at the time of its admission, the objection is waived." *Id.* Nevertheless, it determined that "because the defendant may genuinely have interpreted the court's ruling as conclusively admitting the evidence," it was appropriate to ignore the "waiver doctrine." *Id.* In so holding, it cited case authority for the proposition that a reviewing court may ignore the waiver rule. *Id.* (citing *Eddings v. Dundee Township Highway Commissioner*, 135 Ill.

- 24 -

App. 3d 190, 200, 478 N.E.2d 888, 895 (1985)).

¶ 67          Although *Lundberg* appears to support the existence of the "exception" referenced in *Cunningham*, we note the Second District did not set forth any rationale for its determination that the trial court's motion *in limine* ruling could be viewed as "conclusively admitting *** evidence." *Id.* Significantly, the facts set forth in the decision indicate precisely the opposite—that the trial court lacked time to fully consider the motion *in limine*, its ruling was tentative, and it said it would consider further objections at trial. We find applying the "exception" in these circumstances would result in it swallowing the contemporaneous objection rule, rendering the rule meaningless. Further, the legal authority relied upon by the Second District in *Lundberg* did not address procedures following the denial of a motion *in limine*; instead, it simply set forth the general proposition that a reviewing court is not bound by the "waiver," *i.e.*, forfeiture, rule.

¶ 68          To reiterate, we find no sound basis for the "exception" identified in *Cunningham*, either in the facts of that case or in the case authority it relies upon. Accordingly, we decline to follow *Cunningham* to the extent it holds a trial court's ruling on a motion *in limine* may be found to be "so definite and unconditional" that it obviates the need for a subsequent, contemporaneous trial objection.

¶ 69          Moreover, exacerbating the problem for plaintiff in this case is that not only did she fail to object at trial to the evidence she sought to exclude, she also introduced much of that evidence into the trial during her case-in-chief. A party cannot complain on appeal that the trial court erred in admitting evidence that the party both failed to object to and introduced. *Simmons*, 198 Ill. 2d at 569. Accordingly, assuming plaintiff is correct and the trial court erred in finding defendants could go forward with a sole proximate cause defense based on her conduct, plaintiff's

- 25 -

own action in affirmatively introducing the complained-of evidence during her case-in-chief has forfeited the issue.

¶ 70　　　　　Specifically, on appeal, plaintiff suggests defendants were improperly allowed to present evidence at trial that she (1) failed to inform defendants that she was taking aspirin before her colonoscopy, (2) continued to take aspirin after her colonoscopy, despite instructions to discontinue such medications after her procedure, and (3) failed to report post-colonoscopy symptoms of pain to defendants. Notably, however, plaintiff was the first party at trial to introduce evidence relevant to each of these subjects. Plaintiff presented her own testimony and the testimony of her primary care physician to demonstrate her use of aspirin prior to the colonoscopy. She also testified that she reported her aspirin use to an anesthesiologist on the day of the procedure, and both plaintiff and her husband denied that defendants told plaintiff to avoid taking aspirin after the colonoscopy. Additionally, Dr. Mitchell first testified on direct examination that plaintiff reported taking aspirin after her colonoscopy and that such use increased her risk of bleeding. Further, plaintiff's medical experts—Dr. Sangodeyi and Dr. Fenster—offered opinions that Dr. Karras improperly failed to discover plaintiff's splenic injury after the colonoscopy (Dr. Sangodeyi) and breached the standard of care either by failing to advise plaintiff not to take aspirin prior to her procedure or to cancel the procedure (Dr. Fenster). Dr. Sangodeyi also testified on direct examination that he did not see any documentation in plaintiff's medical records that she was advised to avoid aspirin either before or after her colonoscopy.

¶ 71　　　　　Further, we note that, on review, plaintiff challenges the trial court's denial of her motions *in limine* on a basis not presented to the trial court and which, in fact, contradicts an argument she made to the court below. Specifically, on appeal, plaintiff argues the trial court erred

by denying her motions *in limine* "because the sole proximate cause defense is concerned with the conduct of non-party individuals or other conditions that are the sole cause of harm, and *not* the conduct of the plaintiff." (Emphasis added.) However, before the trial court, she argued that (1) defendants were improperly attempting to allege that she contributed to or exacerbated her injuries under the "guise" of a sole proximate cause defense and (2) there was no evidence in the case to support defendants' claim that her conduct was the sole proximate cause of her injuries. Moreover, contrary to her argument on appeal, she acknowledged in her arguments to the trial court that a sole proximate cause defense *could* be based on a plaintiff's acts or omissions, stating as follows:

> "[Defendants argue] that the 'sole proximate cause defense' need not be explicitly plead[ed] as a defense. Yes, but there must be competent evidence showing that either some third party's acts/omissions *or the Plaintiff's acts/omissions* were *the sole* proximate cause of Plaintiff's injuries. Hence, although it is true that a defendant need not formally plead that plaintiff's acts or omissions were the sole proximate cause of the injuries of which he/she complains in order to assert this defense, here, in light of the facts *** there is no basis for the assertion of the sole proximate cause defense." (Emphasis in original and added.)

¶ 72     Given plaintiff's failure to raise contemporaneous objections to the evidence she challenges, her introduction of that evidence in her case-in-chief, and her failure to present to the trial court one of the specific arguments she now raises on appeal, we agree with defendants that she has forfeited her challenge to the court's pretrial evidentiary rulings. Accordingly, we decline to address the merits of her challenge to the court's rulings on her pretrial motions *in limine*.

¶ 73                              2. *Plaintiff's Motion for a Mistrial*

¶ 74           On appeal, plaintiff next asserts that the trial court erred by denying her motion for

a mistrial based on defendants' presentation of "inadmissible evidence" regarding her conduct in

causing or worsening her splenic injury. She notes the court ultimately ruled defendants did not

present sufficient evidence to support a sole proximate cause defense and asserts she was

prejudiced by the evidence they submitted in attempting to establish that defense. Further, plaintiff

argues defendants' presentation of such evidence "was not an isolated or singular incident" but

"integral" to their case. She contends that although the jury was instructed to ignore the challenged

evidence, the instruction did not cure the prejudicial impact of the evidence.

¶ 75           " 'Generally, a mistrial should be granted where an error of such gravity has

occurred that it has infected the fundamental fairness of the trial, such that continuation of the

proceeding would defeat the ends of justice.' " *Lovell v. Sarah Bush Lincoln Health Center*, 397

Ill. App. 3d 890, 899, 931 N.E.2d 246, 253 (2010) (quoting *People v. Bishop*, 218 Ill. 2d 232, 251,

843 N.E.2d 365, 376 (2006)). "A trial court is vested with broad discretion to determine the

propriety of declaring a mistrial." *McDonnell v. McPartlin*, 192 Ill. 2d 505, 534, 736 N.E.2d 1074,

1091 (2000). The denial of such a motion will not be disturbed on review absent a clear abuse of

discretion. *Lovell*, 397 Ill. App. 3d at 899.

¶ 76           Defendants respond to plaintiff's argument on appeal by asserting she failed to

present a sufficiently complete record for review because no record was made during the trial of

her alleged motion for a mistrial or the trial court's purported denial of that motion. See *Foutch v.*

*O'Bryant*, 99 Ill. 2d 389, 391-92, 459 N.E.2d 958, 959 (1984) ("[A]n appellant has the burden to

present a sufficiently complete record of the proceedings at trial to support a claim of error, and in

the absence of such a record on appeal, it will be presumed that the order entered by the trial court was in conformity with law and had a sufficient factual basis."). Further, although they acknowledge plaintiff's counsel prepared a "bystander's" affidavit addressing the issue of a mistrial request, they assert that affidavit was insufficient to "fill the gap in the transcript" because it was not in compliance with Illinois Supreme Court Rule 323(c) (eff. July 1, 2017).

¶ 77        Rule 323(c) permits "the appellant" to "prepare a proposed report of proceedings" when "no verbatim transcript of the evidence of proceedings is obtainable." *Id.* It further provides as follows:

> "The proposed report shall be served on all parties within 28 days after the notice of appeal is filed. Within 14 days after service of the proposed report of proceedings, any other party may serve proposed amendments or an alternative proposed report of proceedings. Within 7 days thereafter, the appellant shall, upon notice, present the proposed report or reports and any proposed amendments to the trial court for settlement and approval. The court, holding hearings if necessary, shall promptly settle, certify, and order filed an accurate report of proceedings. Absent stipulation, only the report of proceedings so certified shall be included in the record on appeal." *Id.*

¶ 78        Defendants contend the "bystander's" affidavit submitted by plaintiff's counsel is deficient because plaintiff did not seek the input of defendants or the approval of the trial court. However, we note Rule 323(c) speaks in terms of what an "appellant" must do when no verbatim transcript of a proceeding is available. In this case, plaintiff's counsel submitted his affidavit at the same time plaintiff filed her posttrial motion, *i.e.*, when the proceedings before the trial court were

- 29 -

ongoing. Moreover, at the hearing on plaintiff's posttrial motion, her counsel presented argument to the court on the issue of plaintiff's desire for a mistrial based on its denial of a sole proximate cause instruction. Counsel reiterated that the court stated it would not grant a mistrial but would allow a curative instruction. At no time during that hearing did defendants object to plaintiff's counsel's description of the non-transcribed proceedings, nor did the trial court offer any correction or comment. Under these circumstances, we find it is not fatal to plaintiff's claim that her counsel's "bystander's" affidavit did not strictly comply with the requirements of Rule 323(c). Further, we find the record is sufficient for purposes of this appeal to show the court's rejection of a mistrial request.

¶ 79       Nevertheless, although we do not reject plaintiff's claim based on an incomplete record, we do find that her argument on this issue is deficient and that her ultimate claim is without merit. First, plaintiff essentially argues defendants were impermissibly allowed to present copious amounts of prejudicial testimony. However, nowhere in her brief does she identify the specific testimony and evidence she challenges with citation to the record. Additionally, as discussed, our review of the record indicates much of the subject matter of which she now complains was initially introduced during her case-in-chief. Plaintiff cannot demonstrate reversible error under such circumstances. See *Simmons*, 198 Ill. 2d at 569.

¶ 80       Second, we note that in denying plaintiff's posttrial motion, the trial court stated it did not believe "based on the total record and everything that was presented, that the defendant[s] overly blamed the plaintiff for what occurred." Our review of the record leads us to agree that defendants did not present a significant amount of evidence on the subject of plaintiff's actions in causing or worsening her injury. Not only that, but the record shows the court allowed a curative

instruction, advocated for by plaintiff, which directed the jury to disregard the complained of evidence. Therefore, we find no prejudice to plaintiff and that the underlying circumstances did not warrant a mistrial.

¶ 81                               B. Defendants' Closing Argument

¶ 82           Finally, on appeal, plaintiff argues the trial court erred by allowing defendants to assert during their closing argument that they "obtained informed consent from [plaintiff] regarding the risks of injury to her spleen because of language pertaining to 'unforeseen conditions' in [defendants'] patient consent form." Plaintiff maintains such an argument was (1) inconsistent with judicial admissions contained in defendants' answer to her complaint and (2) not supported by the evidence at trial where "the trial court sustained [her] objection to Dr. Karras' testimony regarding the consent form." She seeks reversal of the trial court's judgment and remand for a new trial based on the alleged improper remarks.

¶ 83           Initially, defendants respond that plaintiff has also forfeited this claim of error by failing to raise a contemporaneous objection during closing arguments. See *Babikian v. Mruz*, 2011 IL App (1st) 102579, ¶ 13, 956 N.E.2d 959 ("[T]he failure to object to allegedly improper comments during closing argument operates as a forfeiture of the objection."). However, the record here reflects a lengthy discussion of issues related to the challenged argument during Dr. Karras's testimony and reveals that plaintiff's counsel did voice an objection to the trial court's statement that it would allow defendants to present argument on the "consent" form at issue. Plaintiff also raised the issue in her posttrial motion. Under these circumstances, we decline to find forfeiture and consider the merits of plaintiff's claim.

¶ 84           During closing arguments, attorneys are permitted wide latitude. *Wilson v. Moon*,

2019 IL App (1st) 173065, ¶ 46, 138 N.E.3d 150. "Comments on evidence during closing argument are proper if they are either proved by direct evidence or are a fair and reasonable inference from the facts and circumstances proven." (Internal quotation marks omitted.) *Id.* ¶ 47. "Questions as to the prejudicial effect of remarks made during *** closing argument are within the discretion of the trial court, and determinations as to such questions will not be overturned absent a clear abuse of discretion." *Simmons*, 198 Ill. 2d at 568.

¶ 85        Further, "[i]mproper comments do not constitute reversible error unless they were so prejudicial that defendants were deprived of a fair trial." *Denton v. Universal Am-Can, Ltd.*, 2019 IL App (1st) 181525, ¶ 48, 146 N.E.3d 103.

> "A new trial is not warranted based on an improper opening statement or closing argument unless, when the trial is viewed in its entirety, the argument resulted in substantial prejudice to the losing party or rose to the level of preventing a fair trial. [Citations.] [E]rrors in opening statements or closing argument must result in substantial prejudice such that the result would have been different absent the complained-of remark before reversal is required." (Emphases and internal quotation marks omitted.) *Davis v. City of Chicago*, 2014 IL App (1st) 122427, ¶ 84, 8 N.E.3d 120.

¶ 86        "[J]udicial admissions are formal concessions or stipulations that withdraw a fact from issue and dispense of the need of proof of the fact." *Knauerhaze v. Nelson*, 361 Ill. App. 3d 538, 559, 836 N.E.2d 640, 659 (2005). They must be clear and unequivocal. *Id.* "As a general rule, a statement of fact that has been admitted in a pleading is a judicial admission and is binding on the party making it." *Id.* at 557. However, a party waives any right to rely on admission "by

introducing evidence on the issues which would have been determined by the admissions." *People ex rel. Reynolds v. Aldridge*, 107 Ill. App. 3d 679, 685, 437 N.E.2d 1268, 1272 (1982); see also *Rowe v. State Bank of Lombard*, 247 Ill. App. 3d 686, 696, 617 N.E.2d 520, 528 (1993) ("[A] party waives his right to rely on an admission if he introduces evidence on the issues which would be controlled by the admissions.").

¶ 87 In this case, the record reflects plaintiff's amended complaint contained the following allegation:

"29. Before performing the [c]olonoscopy procedure on [plaintiff] ***, neither Dr. Karras nor any other medical provider at the Springfield Clinic ever advised [plaintiff] about or warned her about the possibility or probabilities of injury to her [s]pleen attendant to the [c]olonoscopy procedure, even though Dr. Karras knew at the time that there was a medically recognized risk of [s]plenic injury as well as [s]pleenectomy [*sic*] attendant to this [c]olonoscopy procedure."

In their answer to plaintiff's amended complaint, defendants admitted the allegations contained in paragraph 29 as set forth above but otherwise denied that they were required to warn plaintiff of the risk of splenic injury.

¶ 88 At trial, defendants attempted to question Dr. Karras regarding a "request and authorization for operation and/or procedure" form, also referred to by the parties as a "consent" form, that was signed by plaintiff and admitted into evidence. Portions of the form contained warnings about "unforeseen conditions" and "different" or "addition[al]" procedures from a colonoscopy. Plaintiff's counsel objected to the questioning, arguing in part that such testimony would improperly contradict defendants' judicial admission to paragraph 29 of her amended

complaint. The trial court sustained the objections to Dr. Karras's testimony but stated it would allow defendants to present closing argument on the topic.

¶ 89 During closing arguments, defendants' counsel argued that the applicable standard of care did not require Dr. Karras to specifically inform plaintiff about the risk of splenic injury prior to her colonoscopy. In arguing the issue of informed consent, counsel also referenced the "authorization" or "consent" form signed by plaintiff and asserted as follows:

"That document talked about unforeseen conditions. Do you remember seeing that? It talked about, you know, unforeseen conditions that may arise and may necessitate different or additional procedures. And unforeseen conditions, nobody foresaw that there would be an injury to her splenocolic ligament. Nobody foresaw that. Nobody could foresee that, you know, there was some connection, and again, this isn't critical of her, it was just sort of function of anatomy, *** some people's ligaments are frail, some of them are broad, some of them are short, and nobody foresaw that, and that is an unforeseeable condition.

In the next phrase[,] *** that consent form talked about unforeseen conditions *** which may necessitate procedures different from or in addition to those contemplated, and you heard testimony, and it's not disputed, additional or different procedures *** was necessitated five days later."

¶ 90 Here, through their answer to plaintiff's amended complaint, defendants conceded that they did not advise or warn plaintiff about the medically recognized risk of splenic injury attendant to a colonoscopy. However, as defendants argue on appeal, plaintiff introduced evidence during her case-in-chief on issues controlled by the admission. Specifically, she presented Dr.

- 34 -

Karras as an adverse witness and elicited testimony that she "wasn't informed [before her colonoscopy] that splenic injury could occur." Plaintiff also elicited testimony from Dr. Fenster that defendants did not give plaintiff "any information about the known serious risk of injury to her spleen or the potential for splenectomy at any time before her colonoscopy procedure." Accordingly, we agree with defendants that plaintiff waived her right to rely on defendants' admission at trial.

¶ 91     Moreover, we find that even assuming the challenged portion of defendants' closing argument was improper, plaintiff was not denied a fair trial, and there was no reversible error. The challenged remarks constituted only a small part of defendants' informed consent argument. The greater weight of their defense of the issue focused on other assertions, including that the standard of care did not require a splenic injury warning or advisement prior to plaintiff's colonoscopy. Ample evidence was presented to support that assertion. Under the circumstances presented, plaintiff is not entitled to a new trial based on the alleged improper arguments.

¶ 92                              III. CONCLUSION

¶ 93     For the reasons stated, we affirm the trial court's judgment.

¶ 94     Affirmed.

**No. 4-19-0697**

| | |
|---|---|
| **Cite as:** | *Arkebauer v. Springfield Clinic*, 2021 IL App (4th) 190697 |
| **Decision Under Review:** | Appeal from the Circuit Court of Sangamon County, No. 12-L-152; the Hon. John W. Belz, Judge, presiding. |
| **Attorneys for Appellant:** | Amelia S. Buragas, of Bolen Robinson & Ellis, LLP, of Bloomington, and Monroe D. McWard, of Taylorville, for appellant. |
| **Attorneys for Appellee:** | Christian D. Biswell, of Drake, Narup & Mead, P.C., of Springfield, and Karen Kies DeGrand and Laura Coffey Ieremia, of Donohue Brown Mathewson & Smyth LLC, of Chicago, for appellees. |